# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LINCARE INC., | ) |
| Plaintiff, | ) Case No. 13-cv-5729 |
| v. | ) Judge Robert M. Dow, Jr. |
| MIDWEST SOLUTIONS FOR SLEEP, d/b/a SLEEP SOLUTIONS, DANIEL LOIZZI, and JOSEPH FIKE, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's motion for partial summary judgment [29]. For the reasons set forth herein, Plaintiff's motion is denied.

**I.    Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party (here, Defendants).[1]

**A.    Asset Purchase Agreement and Sublease**

The issue here is one of contract interpretation, regarding whether Plaintiff successfully triggered the renewal of a commercial lease.

Plaintiff Lincare provides in-home respiratory care, infusion therapy, and medical equipment to patients with respiratory conditions. Defendant Sleep Solutions owned a medical supply company located in Arlington Heights, Illinois. In March of 2012, Plaintiff entered into

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The rule also requires the nonmovant to file a concise response to the movant's statement of facts setting forth "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(3)(A).

an Asset Purchase Agreement with Sleep Solutions (and Sleep Solutions employees Daniel Loizzi and Joseph Fike, collectively "Defendants"), wherein Plaintiff acquired substantially all of Sleep Solutions' assets. In conjunction with this transaction, the parties also entered into a sublease whereby Plaintiff took over the lease on Defendants' property in Arlington Heights.

The initial term of the sublease began on the date of the acquisition, running through April 13, 2013. Included in the sublease was an irrevocable option for Plaintiff to extend the term of the lease until April 14, 2014, provided that two conditions were met: (a) Plaintiff was not in default of the sublease at the time it exercised the option, and (b) Plaintiff provided written notice to Defendants on or before December 15, 2012. The full provision reads as follows:

> The initial term of this Sublease will commence on the Effective Date and continue for a period ending on April 13, 2013. Sublessee will have the irrevocable option, right, and privilege to extend the term hereof until April 14, 2014 (the master lease expiration date), upon the same terms and conditions as set forth herein, except for the rental amount, without the necessity of executing any further agreements; provided (a) Sublessee is not then in default hereunder at the time it exercises any such option, and (b) on or before December 15, 2012, Sublessee notifies Sublessor in writing that it is exercising such option.

[31, at 2.]

### B. The Arlington Heights Property Enters Foreclosure

Six months after the acquisition (on or about October 19, 2012), Plaintiff received a letter from Peak Properties (addressed generally to "Tenants/Occupants of 825 East Golf Road, Arlington Heights, IL"), informing Plaintiff that the property was the subject of a foreclosure action pending in the Circuit Court of Cook County, Illinois (Case No. 12 CH 22713). Peak Properties explained in the letter that Michael Zucker had been appointed as the receiver for the property and that Peak Properties was now acting as the property manager. The letter instructed all recipients to "[p]lease discontinue contact with your current landlord immediately and direct all rent payments and other general questions" to Peak Properties [20-6, at 1], and enclosed a

copy of the court order. The court order itself stated, "The receiver is authorized to collect all rents relating to the property, and the tenants of the property are directed to pay rent to the receiver from the effective date of this order, until further notice." [20-6, at 4.] In response to this letter, Plaintiff sent its November and December rent payments directly to Peak Properties, but in January of 2013, reverted back to sending its rent payments to Defendant Sleep Solutions. It is unclear as to why Plaintiff stopped sending its monthly rent payments to the receiver. Plaintiff says, passively, that it "was subsequently redirected to resume payment of rent checks" to Defendants, but it does not mention under whose direction it did so. [See 31, at 8; 33, at 6.]

C. **Plaintiff's Notice of Renewal of Lease**

Plaintiff alleges that on December 10, 2012—*i.e.*, 5 days before the deadline to renew the Arlington Heights lease—its Corporate Leasing Director Natascha Amster sent a letter to Defendants titled "Lease Agreement for 825 EAST GOLF ROAD, SUITE 1144, ARLINGTON HEIGHTS, IL 60005," enclosing "two copies of the partially executed lease addendums for the property above," requesting that Defendants "[p]lease return one fully executed original to [her] attention at the address below." [20-3, at 2.] The addendum is a one-page document that reflects Plaintiff's exercise of its option to extend the term of the lease until April 14, 2014, and reaffirms that Defendants have no rent obligations under the sublease, per the parties' original agreement. [23-3, at 3.]

Ms. Amster testified that she placed the letter in the mail bin for the mail room employees to pick up. She also testified that if the mail had already gone out that day, she would have re-dated the letter December 11, 2012 and sent it out the next day instead. Plaintiff's mailroom supervisor (Daniel Wilfeard) provided an affidavit based on his 5-1/2 years of experience in Plaintiff's mailroom, claiming that he completes a mail-run every day by

2:00 p.m., wherein he collects all mail placed into "outgoing mail" receptacles by employees and takes it to the mailroom and sorts it into two categories. The first category is for mail marked "certified," "express," or "personal." The mailroom affixes postage to these letters and Mr. Wilfeard deposits them in a U.S. Postal Service mailbox by 2:30 p.m. Ms. Amster's letter falls into the second category, which includes all business mail being sent by regular U.S. Mail. The mailroom places such letters in a bin designated for pickup by a third-party mail service called TC Delivers, Inc., which picks up mail from Plaintiff between 3:30 p.m. and 4:00 p.m. daily. TC Delivers, Inc. then takes the mail to its own facility, where it sorts and postmarks the mail before delivering it to the U.S. Postal Service for delivery to the addressed recipient.

Plaintiff claims that the letter was not returned as undeliverable, and thus assumes that it was delivered. Defendants deny ever receiving Ms. Amster's letter, and they also claim ignorance as to any of the facts related to Plaintiff's mailroom operations.

### D.   The Lawsuit

On August 12, 2013, Plaintiff sued Defendants under a breach of contract theory for failing to honor Plaintiff's request for an extension on the term of the lease.[2] Defendants answered the complaint on September 23, 2013. Over the next year, the parties engaged in discovery, leading up to Plaintiff's filing of a motion for partial summary judgment [19]. Plaintiff's motion prompted Defendants to request several additional depositions (including that of Daniel Wilfeard, Plaintiff's mailroom supervisor), and the briefing schedule for Plaintiff's motion was adjusted to accommodate Defendants' request. After the depositions were completed, Plaintiff filed an amended motion for summary judgment [29] with several updates based on information that came to light during the depositions.

---

[2] Plaintiff invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332, based on complete diversity in the parties (Delaware and Illinois), and an amount in controversy exceeding $75,000.

Plaintiff's motion is styled as a "partial" motion in that it seeks resolution of all matters except for damages. To be clear, Plaintiff's ask the Court to grant summary judgment in its favor on the one and only count (*i.e.*, breach of contract) in its complaint. The parties agree that disputes related to the Asset Purchase Agreement are governed by Illinois law.

## II.     Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a

lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III. Analysis

Under the terms of the sublease, Plaintiff had an irrevocable right to extend the term of the lease period for one additional year provided that (a) Plaintiff was not in default of the sublease at the time it exercised its option, and (b) Plaintiff provided written notice to Defendants on or before December 15, 2012. The parties agree as to the relevant issues in dispute, which are (1) whether the foreclosure action on the leased property excused Plaintiff's technical default of the sublease, and (2) whether Plaintiff's letter dated December 10, 2012—which Defendants claim they never received—satisfies Plaintiff's written-notice requirement. The Court addresses each issue in turn.

#### A. Contractual Default

Plaintiff's first contractual hurdle to securing a renewal of the lease is to establish that it was not in breach of the sublease when it requested the lease extension. Defendants argue that Plaintiff failed to pay rent in November and December 2012 as required by the contract, thereby putting it in default. Plaintiff cites to the doctrine of impossibility and argues that a court order required it to send its rent payments directly to the property receiver, thus excusing its default.

Plaintiff concedes that, technically speaking, it was in default of the sublease when it requested the lease extension because it failed to make its rent payments to Defendants as required by the contract. [See, *e.g.*, Pl.'s Mem., 31, at 7 (referring to its "technical default at the time of its Sublease renewal").] However, Plaintiff argues that its technical breach should be

excused by the Illinois doctrine of impossibility, which "excuses performance where performance is rendered objectively impossible * * * by operation of law." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 933 N.E.2d 860, 865 (Ill. App. Ct. 2010) (noting that the doctrine is "narrowly applied"); see also *Felbinger and Co. v. Traiforos*, 394 N.E.2d 1283, 1289 (Ill. App. Ct. 1979) ("A contractual duty may be discharged where performance is subsequently prevented or prohibited by judicial action.").

Plaintiff cites to the judge's order from the foreclosure proceedings, which says that "[t]he receiver is authorized to collect all rents relating to the property, and the tenants of the property are directed to pay rent to the receiver from the effective date of this order, until further notice." [20-6, at 4.] In its attempt to comply with the court's order, Plaintiff apparently assumed that it, as the sublessee and then-current occupant—as opposed to Sleep Solutions, the lessee—was the applicable tenant, and thus made its November and December payments directly to the receiver instead of to Defendants. This is a reasonable interpretation of the state court order. But blurring the issue is the fact that in January of 2013 Plaintiff inexplicably reversed course and resumed sending its rent payments to Defendants, implying that such payments were not impossible after all. Plaintiff offers no explanation for this shift in position, claiming only that it "was subsequently redirected to resume payment of rent checks" to Defendants. Plaintiff's careful wording might be meant to imply that the state court was the one doing the redirecting (or perhaps the receiver), but Defendant attacks this inference, claiming that the decision came from Plaintiff's employee Jennifer Jordan, and not from the state court or the receiver. [33, at 6.]

The question, then, is whether Plaintiff correctly interpreted a court order that created an excusable impossibility, or whether Plaintiff misread the order as presenting a legal obligation and thus mistakenly defaulted on the terms of the sublease. Because the Court is tasked with

construing all facts and reasonable inferences in the light most favorable to the Defendant, and because the doctrine of impossibility is to be interpreted narrowly, the Court concludes that an issue of fact exists as to whether Plaintiff was required to make payments to the receiver instead of to Defendants during November and December of 2012. See, *e.g.*, *Shapo v. Underwriters Mgmt. Corp.*, 2002 WL 31155059, at *14 (N.D. Ill. 2002) ("Plaintiff has shown nothing to demonstrate that * * * he would have been prohibited by law from honoring the [parties'] Agreement, had he decided to do so."); *Joseph W. O'Brien Co. v. Highland Lake Constr. Co.*, 307 N.E.2d 761, 763–64 (1974) (finding that a certain action was not impossible in part because the plaintiff subsequently carried out the action); *Pancoe v. Singh*, 876 N.E.2d 288, 297–98 (Ill. App. Ct. 2007). Because this issue cannot be resolved on summary judgment, Plaintiff's motion must be denied.

### B. Notice in Writing

To trigger renewal of the lease under the contract, Plaintiff was also required to "notif[y] [Defendants] in writing that it [wa]s exercising such option" on or before December 15, 2012. [See 31, at 2.] To recap the relevant facts, Plaintiff's Corporate Leasing Director, Natascha Amster, testified that on December 10, 2012, she drafted a letter to Defendants that included a proposed contract addendum reflecting Plaintiffs decision to extend the term of the lease another year, and put the letter in her outgoing mailbox. After that, according to Plaintiff's typical business operations, the letter would have been picked up by mailroom staff and then transferred to Plaintiff's mail-service provider, TC Delivers, Inc., later that afternoon. TC Delivers, Inc. was responsible for adding postage to the letter and depositing the letter with the U.S. Mail for delivery to the addressee. Defendants claim that they never received the letter.

"Illinois courts employ a presumption that 'a letter properly addressed and with proper postage is presumed received by the addressee in due course. Denial of receipt by [the] addressee rebuts the presumption, in which case the issue becomes a question of fact to be decided by the trier of fact.'" *Weisberg v. Handy & Harman*, 747 F.2d 416, 421 (7th Cir. 1984) (quoting *Liquorama v. Am. Nat'l Bank & Trust*, 408 N.E.2d 373, 375 (Ill. 1980)); see also *Silverado Grp., LLC v. Ed's Towing, Inc.*, 2012 IL App (2d) 120629-U, at *8 (Ill. App. Ct. Dec. 24, 2012) (same); *Clark v. Robert W. Baird Co., Inc.*, 152 F. Supp. 2d 1040, 1044 (N.D. Ill. 2001) (same). Here, Plaintiff represents that its mail service, TC Delivers, Inc., is the entity responsible for providing proper postage for its business letters. Plaintiff did not provide any information regarding TC Delivers' practices or procedures,[3] and glosses over the issue of whether relinquishing mail to a third-party mail service is sufficient to trigger the mailbox-rule presumption.[4] But even if Plaintiff could establish that transferring its postage-less letters to its mail service were sufficient to earn it a presumption in its favor, that presumption is rebutted by the fact that Defendant denied receiving the letter. Specifically, Defendant Joseph Fike testified that he opened and reviewed all mail received by Defendant Sleep Solutions on a daily basis in 2012, and that he did not receive any notice of extension from Plaintiff in 2012. [32, at 3.] This creates a question of fact to be decided by the trier of fact. See, *e.g.*, *Davenport v. Potter*, 2008 WL 4126603, at *4 (N.D. Ill. Aug. 15, 2008) ("Because Davenport has denied under oath that

---

[3] But see *Buckingham Corp. v. Ewing Liquors Co.*, 305 N.E.2d 278, 282 (Ill. App. Ct. 1973) ("No one from [Plaintiff's] mailing service testified to the completion of the actual mailing.").

[4] Plaintiff argues that the "rapid decline of the United States Postal Service in an internet-infused world" is responsible for the lack of case law regarding the effect of third-party mail services on the mailbox rule. [39, at 5.] But this misstates Plaintiff's problem. Plaintiff claims that its letter *was* deposited with the U.S. Mail Service, but that TC Delivers did the depositing. Thus, to earn its presumption under the mailbox rule, Plaintiff must add one more link to its chain of delivery to complete the journey from author to mailbox (*e.g.*, by providing an affidavit from TC Delivers regarding their routine practices). Plaintiff improperly treats its third-party mail service as the mailbox and thus falls short of meeting its burden.

she received or refused the removal notice, there is a genuine factual dispute that renders summary judgment inappropriate.").

Plaintiff argues that whether Defendants received the letter is irrelevant, because the contract only requires Plaintiff to "notif[y] [Defendants] in writing," which it claims it accomplished by simply placing the letter into the mail (or, more accurately, by giving the unstamped letter to its mail service). While the Court agrees that more specific contractual language regarding the means of delivery might have streamlined this analysis, Plaintiff's argument nonetheless fails to advance the ball in its favor. First, Plaintiff does not provide any support for its one-party notification theory (*i.e.*, that the concept of notification is agnostic as to whether the person to be notified actually is notified). Second, in arguing its point, Plaintiff inevitably reverts back to the mailbox-rule cases, arguing that the common law rule of "acceptance when mailed" applies. Not only does this conflate Plaintiff's plain-language argument with its mailbox-rule argument (consequently inviting in all of Plaintiff's mailbox-rule problems), but it also misstates the issue, which is not whether Defendants *accepted* anything, but rather whether Plaintiff provided written notice to Defendants. Whether Plaintiff notified Defendants in writing of its intent to renew the lease is a disputed question of fact, making summary judgment inappropriate.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for partial summary judgment [29] is denied.

Dated: May 14, 2015

_____
Robert M. Dow, Jr.
United States District Judge